UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------X

MILLIPORE CORPORATION,        )
      Plaintiff,            )     Civil Action No.  09-10765 DPW
                      )
v.                    )
                      )     AFFIDAVIT OF ALEXANDER H. SLOCUM, Ph.D.,
                      )     IN SUPPORT OF MILLIPORE'S MOTION
W. L. GORE & ASSOCIATES, INC.,   )     FOR RECONSIDERATION OR
Defendant.               )     <u>TO ALTER OR AMEND A JUDGMENT</u>

-----------------------------------------------------X

COMMONWEALTH OF MASSACHUSETTS   )
COUNTY OF MIDDLESEX            ) ss.

      Alexander H. Slocum, Ph.D., being first duly sworn on his oath deposes and says that:

      1.      I am a Professor of Mechanical Engineering at the Massachusetts Institute of Technology in Cambridge, Massachusetts.

      2.      I have been retained by counsel for Millipore Corporation.

      3.      I have previously submitted an affidavit in support of Millipore Corporation's Opening Claims Construction Brief, accompanied by my then current *Curriculum Vitae*.

      4.      I have previously submitted an affidavit in support of Millipore Corporation's Opposition to Summary Judgment, accompanied by my then current *Curriculum Vitae*.

      5.      I make this affidavit in support of Millipore Corporation's Motion for Reconsideration or to Alter or Amend a Judgment.

      6.      In addition to documents identified in my previous Affidavits in this case, I have read the Memorandum and Order dated September 20, 2010 ("Memorandum and Order").  I have reread some of the previously studied documents, particularly U.S. Patent No. 7,293,477 ("'477 Patent"), in connection with this Affidavit.

7.      In reviewing the Memorandum and Order, it appears that there is a
misunderstanding as to which "opening" is the opening in Claims 1 and 5 in each of 1) Figure 2
of the '477 Patent, 2) the Gore sampler, and 3) Figure 2B of Jaeger.  The Memorandum and
Order consistently considers an opening that is not an opening to a passage when discussing
Figure 2 of the '477 Patent, the Gore sampler, and Figure 2B of Jaeger.  I consider the
identification of the correct opening as the claimed opening to be critical because it is my
opinion that focusing on the correct opening, as required by Claims 1 and 5, which is the opening
to a passage in the elongate member, would change the conclusions reached by the Court.

8.      The following is part of Claim 1, with the words "opening" and "passage"
highlighted:

> (a)      ... the elongate members having a cap and an **opening** to a **passage** of the
> elongate member behind the cap, the elongate members being displaceable
> between 'open' and 'closed' positions such that fluid can flow into the **opening**
> behind the cap and through said **passage** in each member when in said 'open'
> position, but not in said 'closed' position;
>
> (b)      a plurality of flexible conduits, equal in number to said plurality of shafts,
> each flexible conduit in fluid communication with an individual **passage** of a
> member;
>
> ...

The following is part of Claim 5, with the words "opening" and "passage" highlighted:

> (a) a body and one or more elongate members ... said one or more elongate
> members having a front and a back and shaped to fit substantially water-tight
> within said one or more shafts, said elongate members being fitted within said
> shaft with the front thereof proximate said first open end and the back thereof
> proximate said second open end, said one or more elongate members having a cap
> and an **opening** to a **passage** of each of the one or more elongate members behind
> the cap, ...
>
> (b) one or more sterilized flexible tubes connected to said back of each of said on
> or more elongate members;
>
> ...

9.      It is my understanding from the claims and the specification of the '477 Patent that the "opening" that is labeled with reference numeral 34 in Figure 2 is "an opening to a passage of the elongate member" in Claim 1.  Claim 1 refers to a passage of the elongate member, which is the passage between front $30_A$ and back $30_B$ in elongate member 30.  This is confirmed in the specification at Col. 5, ll. 3 to 10:

> As shown in FIG. 2, each elongate member 30 is preferably configured as a hollow tube with a fluid passage way running substantially the entire length front $30_A$ to back $30_B$, culminating in openings 34 and 32 on both ends of the member.

In addition, part (b) of Claim 1 indicates that a plurality of flexible conduits are in fluid communication with an individual "passage" of a member.  Therefore, consistent with my understanding of "opening" in Claim 1, the opening is to a passage in the elongate member that leads to a flexible tube.



Figure 2

10.      Similarly, I understand that the "opening" that is labeled with reference numeral 34 in Figure 2 of the '477 Patent is the "an opening to a passage of each of the one or more elongate members" in Claim 5, the passage being between front $30_A$ and back $30_B$ in elongate

member 30, as confirmed in the previously quoted portion of the specification at Col. 5, ll. 3 to 10.  In addition, consistent with my understanding of "opening" in Claim 5, the opening is to a passage in at least one elongate member that is connected at the back to a flexible tube, as provided in (b) in Claim 5.

11.     In the Gore products, the Five-Valve Sampler and the Single-Valve Sampler ("Gore sampler"), the "opening," as that term is used in Claims 1 and 5, would be the opening to the elongate member, which I understand has also been referred to as a "rigid rod" in this case. The opening to the passage is identified as OPENING in the following photograph of a Gore sampler.

D.I. 30 - Declaration of Domenic Sciamanna
(Identification of "Opening" and "Shaft opening" added)



Opening

Shaft opening

CROSS-SECTION OF GORE'S SINGLE-VALVE DEVICE

12.     The Memorandum and Order at page 39, footnote 12 states that "the 'rigid rod' has an opening located in the *back* of the silicone seal."  It is this opening that I consider to be the "opening" as that term is used in Claims 1 and 5.  In the Gore device, fluid enters the shaft

and then flows into the opening, through the passage of the elongate member, and then to the flexible tube or conduit.

13.     The Memorandum and Order at pages 38 to 39 focused on a different opening, which is the opening to the shaft in the Gore device.  The opening to the shaft is identified as SHAFT OPENING in the above photograph of a Gore sampler.  This opening is different from the opening to a passage in the elongate member, and the opening to the shaft is not the opening to a passage required by Claims 1 and 5.  As a result of the Court focusing on the wrong opening, the Court concluded that "no jury could reasonably conclude that the opening through which the fluid flows[1] in the Accused Products is placed behind the cap.  To the contrary, the opening of the Accused Products is located in *front*, rather than in back, of the silicone seal.  [Footnote 12 discussed above omitted.]  For this additional reason, I conclude that there can be no literal infringement."  Memorandum and Order at page 39.  Focusing on the correct opening would lead to the proper conclusion that the opening in the Gore sampler is behind the cap.  *See* Memorandum and Order footnote 12.

14.     With a proper understanding of "opening" as used in Claims 1 and 5, proper identification of the opening in 1) Figure 2 of the '477 Patent, 2) the Gore sampler, and 3) Figure 2B of Jaeger become apparent.

15.     I understand from the Memorandum and Order that the Court construed the term "cap" by determining the function, the structure, and the location of the cap relative to the "opening behind the cap."  (Memorandum and Order, pp. 11-19.)

16.     With respect to the function of the cap, the Court determined that the "cap" is "a feature that creates a liquid-tight seal and can, but is not required to, prevent the elongate

---

[1] I do not see the language "opening through which the fluid flows" in any claim in the '477 Patent and I do not know the source for this language.  Rather, Claims 1 and 5 refer to an opening a passage of the elongate member.

member from being pulled out of the shaft." (Memorandum and Order, p. 15.) In my opinion, the Court is correct in determining the cap performs that function.

17.     With respect to the location of the cap relative to the opening in the elongate member, I understand that the Court construed the location of the opening vis-à-vis the cap as "the opening is located at the back of the cap." In my opinion, the Court is correct in stating this location for the cap. (Memorandum and Order, p. 19.) The Court indicated in footnote 12 to the Memorandum and Order (p. 39) that there is an opening into the Gore's "rigid rod"(*i.e.* the "elongate member") located at the back of Gore's "silicone seal," which in my opinion should be considered the "cap" in the Gore device. As discussed above, the opening referenced by the Court in footnote 12 is the claimed opening to a passage in the elongate member. Therefore, the location of Gore's cap relative to the opening in the elongate member is such that the opening is behind the cap as claimed in Claims 1 and 5.

18.     With respect to the structure of the cap, I understand that the Court construed the structure as being "part of the same structure as the elongate members, rather than as a distinct element" in the Memorandum and Order at pages 18 and 38. I believe this is not the correct construction as I continue to have the opinion stated in my Affidavit dated January 20, 2010, based on my experience and my review of the '477 Patent and the prosecution history. Specifically, one of ordinary skill in the art at the time the invention in the '477 Patent was made would understand from the plain meaning of "cap" and "elongate member," as these terms appear in Claims 1 and 5, that "cap" and "elongate member" can be either a part of the same structure or can be distinct from one another. By the term "distinct" I mean that the "cap" is not a portion of the elongate member, but it may or may not be detachable from the elongate member.

19.     Consistent with my previously stated opinion, I believe that one of ordinary skill in the art of machine design would understand that convenience of assembly may require that the "cap" be distinct and that it may be detachable from the "elongate member."

20.     Figure 2 of the '477 Patent shows a cross-section of an example of the device of the '477 Patent.  In the cross-section, there is a vertical line between the cap (65) and the elongate member (30).  This vertical line means that the cap is not part of the elongate member.  One of ordinary skill would understand that Figure 2 is showing a cap that is not part of the structure of the elongate member.  One of ordinary skill in the art of machine design would understand that whether cap (65) and elongate member (30) are part of the same structure is a design choice.  For example, ease of manufacture may suggest assembly of the device by placing elongate member (30) inside shaft (26) by inserting it through the second open end 22, then the first open end 24, and then attaching cap (65).  Alternatively, elongate member (30) and cap (65) can be manufactured from the same piece of material, and the device body (20) assembled or otherwise manufactured around the combined elongate member and cap structure.  In the particular example depicted in Figure 2, the cap and elongate member as drawn are of the same material because the cross-hatching is the same, but in my opinion one of ordinary skill would understand from Figure 2 that the cap and the elongate member could be of the same or different material because they are not shown as part of the same structure.

21.     Therefore, based on my review of Figure 2, design choices could lead to a "cap" that is separate and distinct from the elongate member.

22.     I have studied the discussion of the prosecution history that appears at pages 17 and 18 of the Memorandum and Order and the related portions of the prosecution history

mentioned in the Memorandum and Order concerning Jaeger.  I consider the Examiner's

discussion of Jaeger to be consistent with my opinion concerning the structure of the cap.



**FIG. 2B**

Jaeger samples wine, presumably in a sterile manner, but no single "[elongate] member" includes both a cap and an opening to a passage. Member 106/102 is certainly a cap, but there is no opening. Elements 106/102 and 60 [80] do provide for an opening [and] a cap, but they are not collectively [on] a single member.

23.     Figure 2B of U.S. Patent No. 6,860,162 ("Jaeger reference") above, with

annotations added to the figure.  On page 124 of the prosecution history for the '477 Patent (D.I.

37-3), the Examiner focused on Figure 2B in his description of the Jaeger reference, stating that,

"Jaeger shows (Figure 2B) that a piston 68 on a rod is clearly a stop/limit/anchor."  In Figure 2B

there are at least two parts that could be considered an "elongate member," the horizontal piece

with reference numeral 96 (the label "elongate member (horizontal) (96)" is added to Figure 2B

above), and the vertical piece with reference numeral 76 (the label "elongate member (vertical)

(76)" is added to Figure 2B above).  The Examiner says on page 124 of the prosecution history,

"Jaeger samples wine, presumably in a sterile manner, but no single 'member' includes both a

cap and an opening to a passage."  I understand this to means that whether focusing on the

vertical member or the horizontal member, neither one has both a cap and an opening to a

passage (the labels "cap," "opening," and "passage" are added to Figure 2B above) and I will focus on each separately in the following paragraphs.

24.     The horizontal member (referred to as a plunger (96) in the Jaeger patent) extends through the probe shaft (passage (68)).  (Jaeger reference, Col. 7, ll. 21 to 22.)  The plunger (96) is like the elongate member in the shaft of Figure 2 of the '477 Patent, but the plunger (96) has no passage in it, it is a solid rod.  As a result, there can be no opening to a passage in the elongate member (plunger) because there is no passage in the elongate member (plunger).  The Examiner continues  on page 124, "Member 106/102 is certainly a cap, but there is no opening."  Therefore, even though 106/102 is distinct from the elongate member, as shown in Figure 2B, the Examiner concludes that it is "certainly a cap."  I agree with the Examiner's conclusion.

25.     The vertical member of Figure 2B in Jaeger (referred to as a handle (76) in the Jaeger reference) has a passage (78).  The Jaeger reference states that "A passage 78 extends through the handle 76 between a sample outlet 80 from the probe passage 68 and a sample discharge port 82 from the handle passage ... ."  Jaeger Col. 6, ll. 43 to 48.  Therefore, there is a passage in the vertical elongate member.  In the prosecution history of the '477 Patent at page 124, the Examiner notes that, "[e]lements 106/102 and 60 do provide for an opening a cap, but they are not collectively a single member.  Of course, element 60 does not have a cap."  It appears that the Examiner made a typographical error when he referred to element 60 because the Jaeger reference indicates that element (60) is a "bushing."  Jaeger Col. 6, line 38.  This "bushing" is depicted in Figure 1 of Jaeger.  As indicated in the quotation from Jaeger above, there is a sample outlet (80) from the probe passage (68), and I believe that the Examiner intended to refer to this as the "opening."  Therefore, it is my understanding that the Examiner was indicating that the horizontal "member" has a cap "106/102" and the vertical "member" has

an opening, but no single member has both a cap and an opening, because these are separate elongate members.  In saying that "element 60 [*sic*] does not have a cap" the Examiner is likely referring to the absence of any "cap" associated with "sample outlet" (80) on the vertical elongate member.  Alternatively, the Examiner could have meant the vertical member (handle 76) instead of 60 when he said, "element 60 does not have a cap" as it is true that the vertical member does not have a cap, even though it does have an opening.  Whatever was intended when the erroneous reference numeral 60 was used, it does not alter the Examiner's conclusion that the cap 106/102 in the Jaeger reference is certainly a cap, and I agree with the Examiner's conclusion.

26.     At page 18 of the Memorandum and Order, the Court is again focusing on the wrong opening when considering the Examiner's discussion of the "cap and the opening provided in Jaeger."  The Court may have considered the "opening" in this discussion to be the opening to probe passage (68), but this passage runs along the <u>outside</u> of elongate member (96). Thus, this opening is not an opening to a passage of the elongate member, as required by Claims 1 and 5.  As discussed above, it is my opinion that the Examiner was referring to outlet (80) as the opening in Jaeger.

27.     In summary, it is my opinion that the proper interpretation of Jaeger and the statements made by the Examiner at page 124 of the '477 Patent Prosecution History Record support the determination that the "cap" of the device of the '477 Patent can be distinct from the "elongate member" because the Examiner concludes that 102/106 is "certainly a cap" and Figure 2B clearly shows that it is distinct from the elongate member (plunger 96).  One of ordinary skill in the art, reading the '477 Patent as of December 23, 2003, would understand that the "cap" in the claims could be distinct from the elongate member.

28.     In view of the above, it is my opinion that the "cap" of Claims 1 and 5 of the '477 Patent is found in Gore's Five-Valve Sampler and it is the silicone seal.  Like 106/102 in the Jaeger reference, the silicone seal is certainly a cap.

29.     With respect to the function of the "cap," the Memorandum and Order indicates that a jury could reasonably find that the Accused Products perform the same function, to create a liquid seal.  Memorandum and Order at p. 37.  I agree with the Court's conclusion.

30.     With respect to the location of the "cap" relative to the opening in the elongate member, as noted by the Court in footnote 12, page 39 of the Memorandum and Order, Gore's "rigid rod has an opening in the back of the silicone seal."  Thus, I agree that Gore's silicone seal satisfies the Court's criterion for the location of the "cap" relative to the opening.

31.     With respect to the structure of the "cap," as I explained above, it is my opinion that the "cap" and the "elongate member" can be either a part of the same structure or can be distinct from one another.  Because Gore's silicone seal is on the elongate member, in my opinion, Gore's silicone seal satisfies the "structure" criterion for the "cap," even though it is distinct from Gore's rigid rod.

32.     Alternatively, adopting the determination in the Memorandum and Order that the "cap" and the "elongate member" are part of the same structure, it is my opinion that the differences between the accused device and the device claimed in the '477 Patent, thus construed, are insubstantial.

33.     As stated hereinabove, the function of the cap is to create a liquid-tight seal.  The way the liquid-tight seal is created is that the cap is pressed against the body of the device when the elongate member is in the closed position, with the result preventing fluid from flowing from the vessel past the cap.

34.     It is my opinion that the "silicone seal" of Gore's Five-Valve Sampler performs substantially the same function in substantially the same way to obtain the same result as the "cap" of Claim 1 of the '477 Patent.  Gore's "silicone seal" functions to create a liquid-tight seal by being pressed against the body of the device when the elongate member is in the closed position, with the result preventing fluid from flowing from the vessel past the cap.  For example, in Exhibit C(a) to Millipore's Initial Infringement Contentions (Docket Item 19-2), right panel, one elongate member is in the open position and four elongate members are in the closed position.  Comparison of the open shaft to a closed shaft indicates that Gore's "silicone seal" creates a liquid-tight seal by being pressed against the body of Gore's device.

35.     The analysis provided in the above paragraph does not depend on the structure of the "cap"; a "cap" that is distinct from an "elongate member" performs substantially the same function, in substantially the same way to obtain the same result as a "cap" that is a part of the structure of the "elongate member."

36.     In view of the above, it is my opinion that any differences between the "cap" of Claim 1 and the "silicone seal" of Gore's Five-Valve Sampler are insubstantial.

37.     It is further my opinion that the analysis applied above with respect to Gore's Five-Valve Sampler and the device of Claim 1 of the '477 Patent applies equally to Claim 5 of the '477 Patent.  Accordingly, it is my opinion that any differences between the "cap" of Claim 5 and the "silicone seal" of Gore's Five-Valve Sampler are insubstantial.

38.     It is further my opinion that Gore's Single-Valve Sampler includes a "silicone seal" that performs substantially the same function in substantially the same way to obtain the same result as the "cap" of Claim 5 of the '477 Patent.  The reasoning for my opinion is the same as the reasoning presented above for Gore's Five-Valve Sampler and Claim 5, the only

difference being that Gore's Single-Valve Sampler has a single elongate member, instead of five elongate members.

39.     There are many manufacturing decisions to be made in commercializing a product depicted in a patent.  For example, in addition to the parts shown in the example depicted in Figure 2 of the '477 Patent, there can be any number of parts added in order to manufacture the device.  For example, simple machines, such as inclined planes, wheel and axle, lever, pulley, wedge, or screws, as well as motors, can be added to arrive at a commercial product.  These additions may build on the original design without changing the adoption of the features in the patent.

40.     The Memorandum and Order indicates that, "my examination of the Accused Products, which depend upon a lever mechanism for sealing, satisfies me as a matter of law that they do not" "establish that the Accused Products achieve sealing the same way as is claimed in the '477 Patent."  Memorandum and Order at page 47.  It is my opinion that the Court's conclusion that the Accused Products do not achieve sealing the same way as is claimed in the '477 Patent based on the addition of the lever is incorrect.  The lever mechanism provided in this commercial product is to facilitate movement of the elongate members within the shaft and to act as an anchor.  For the reasons stated above, it is my opinion that Accused Products do achieve sealing the same way as is claimed in the '477 Patent.  The addition of the lever does not change my opinion that the differences between the cap in the Accused Products and the devices claimed in Claims 1 and 5 are insubstantial.

41.     There is a further alternative using the Court's construction of the term cap in Claims 1 and 5 so that the "cap" and the "elongate member" are part of the same structure.  One of ordinary skill in the art at the time when the invention was made could understand that the tip

of Gore's "rigid rod" may be described as a "cap."  This portion of the "rigid rod" is shown

below:



42.     With respect to the function of the "cap," the function of the cap is to create a

liquid-tight seal.  The tip of Gore's "rigid rod" creates a liquid-tight seal by pressing Gore's

"silicone seal" against the body of the device with the result of preventing fluid flow to the

opening in the elongate member when the elongate member is in the closed position.  Thus, the

tip of Gore's "rigid rod" satisfies the Court's criterion for the function of the "cap."

43.     With respect to the location of the "cap" relative to the opening in the elongate

member, the tip of Gore's "rigid rod" has an opening behind the tip.  Thus, the tip of Gore's

"rigid rod" satisfies the Court's criterion for the location of the "cap."

44.     With respect to the structure of the "cap," the tip of Gore's "rigid rod" and the

"rigid rod" itself are a part of the same structure.  As such, the tip of Gore's "rigid rod" satisfies

the "structure" criterion for the "cap," as defined by the Court.

45.     In the context of Claim 1, the term "positioned adjacent" is used, as stated in the

Memorandum and Order at page 23, to designate which end of the elongate member is nearest to

the fluid receptacle.  The construction of positioned adjacent as "nearby" previously stated in my

Affidavit dated January 20, 2010 is consistent with this statement in the Memorandum and

Order, and I continue to consider nearby to be the construction that should be adopted for this

term.[2]  Alternatively, "positioned adjacent" could be construed as "designating which end of the

elongate member is nearest to the fluid receptacle" as indicated in the Memorandum and Order at

page 23.

46.     The Court proceeds to consider the intrinsic evidence in the specification of the

'477 Patent at Col. 4, ll. 57-67 and construes "adjacent" as "next to or adjoining with no

intervening structure between the elongate members and the fluid receptacle."  I do not agree

with this construction.  In arriving on the construction based on the intrinsic evidence, the Court

reasons that the specification requires the elongate member to stop the flow of fluid when placed

in the closed position and concludes that there can be no intervening structure between the

elongate member and the fluid receptacle.  Memorandum and Order at 23 to 24.  It is my opinion

from an examination of Col. 4, ll. 57-67 and Claim 1 that the elongate members are not

themselves required to stop the flow of fluid when in the closed position.  Rather, the

specification requires that the release of fluid out of the fluid receptacle be frustrated <u>when</u> the

elongate members occupies the closed position.  It does not require that the release of fluid be

frustrated <u>by</u> the elongate members.  Similarly, Claim 1 states that fluid cannot flow into the

opening behind the cap and through said passage in each elongate member <u>when</u> the elongate

member is in "closed" position.  Nothing in either the '477 Patent or in Claim 1 requires that the

elongate member *itself* "stop the flow of fluid."  Rather, it is placing the elongate member into

the "closed" **position** that stops the flow of fluid into the opening behind the cap.  Therefore, it is

my opinion that the Court's conclusion that the specification requires the elongate member to

stop the flow of fluid when placed in the closed position is incorrect.  To the contrary, it is the

cap that creates a liquid tight seal when the elongate member is in the closed **position**.  *See* '477

---

[2] I previously provided my opinion concerning whether adjacent allows for there to be additional structure.
Although I continue with this opinion, I do not consider it to be critical to the understanding of the term adjacent.  It
is my opinion that Gore's devices meet this limitation of Claim 1.

Figure 2 and above discussion of the cap.  Therefore, the intrinsic evidence is only indicating the consequence, "that the release of fluid out of said fluid receptacle ... is frustrated" <u>when</u> the elongate member is in the closed **position**.

47.     The Memorandum and Order construes "adjacent," but I consider the word "positioned" to be important to an understanding of the use of "positioned adjacent" in Claim 1. In context, Claim 1 states, "the elongate members having a front and a rear with the front of the elongate members being positioned adjacent a fluid receptacle."  Because the intrinsic evidence that is the focus of the Court's analysis does not require that an elongate member itself stop the flow of fluid when it is in the closed position, intervening structure is not excluded by the intrinsic evidence.  In addition, because Claim 1 is only indicating the position (or orientation in space) of the front of the elongate member, which the Court correctly states at page 23 of the Memorandum and Order is to designate which end of the elongate member is nearest to the fluid receptacle, it is my opinion that "adjacent" should be construed in Claim 1 as "nearby."

48.     Even if the Court continues to construe the term "positioned adjacent" as indicated in the Memorandum and Order, it is my opinion that the difference between the Gore sampler and the device of Claim 1 are insubstantial.  Because Gore's rigid rod ("elongate member") and silicone seal (" cap"), in cooperation, perform substantially the same function in substantially the same way to achieve the same result as the elongate member and a cap of Claim 1, the presence or absence of an "intervening structure" between the elongate member and the fluid receptacle is insubstantial.

49.     The *function* of the combination of the elongate member and the cap in the Gore sampler is to press the cap against the body of the device so that a liquid-tight seal is created at the shaft opening when the elongate member is in the "closed" position.  The *way* in which this

function is performed is by moving the elongate member between "open" and "closed" positions. The result of performing the specified function in the specified way is preventing fluid flow through the shaft opening and, therefore, through the device.

50.     It is my opinion that the "elongate member" and "cap" of Gore's Five-Valve Sampler, in cooperation, perform substantially the same function in substantially the same way to obtain the same result as the "elongate member" and the "cap" as claimed in Claim 1 of the '477 Patent.  The *function* of Gore's "elongate member" and "cap" is to press Gore's "cap" against the body of Gore's device so that a liquid-tight seal is created at the shaft opening when the "elongate member" is in "closed" position.  The *way* in which this function is performed is by moving the "elongate member" between "open" and "closed" positions.  The result of performing the specified function in the specified way is preventing fluid flow through the shaft opening and, therefore, through the device.  For example, Exhibit C(a) to Millipore's Initial Infringement Contentions (Docket Item 19-2), right panel, shows one shaft (106) open and four shafts (106) closed.  Comparison of the open shaft to a closed shaft indicates that Gore's "cap" creates a liquid-tight seal at the opening of shaft (106) by being pressed by the elongate member against the body of Gore's device.  The *way* in which this function of Gore's "cap" is performed is by moving Gore's "elongate member" between "open" "closed" positions.  This analysis is independent of the presence or absence of an "intervening structure" between an elongate member and the fluid receptacle; Gore's "elongate member" and "cap," in cooperation, perform substantially the same function, in substantially the same way to obtain the same result as the "elongate member" and the "cap" of Claim 1 of the '477 Patent, with "adjacent" construed as indicated in the Memorandum and Order.

Case 1:09-cv-10765-DPW   Document 76   Filed 10/15/10   Page 18 of 18



51.     In view of the above, it is my opinion that any differences between the "elongate member" and the "cap" of Claim 1 with the construction of "adjacent" as indicated in the Memorandum and Order and the positioning of the "elongate member" and "cap" of Gore's Five-Valve Sampler are insubstantial.

52.     With respect to the remaining claim terms construed by the Court, it is my opinion that the Gore devices literally meet the claim terms as the Court construed them.

Subscribed and sworn under the pains and penalties of perjury this 15th day of October 2010.

/s/      Alexander H. Slocum
Alexander H. Slocum, Ph.D.
Professor of Mechanical Engineering
Massachusetts Institute of Technology

1026373.1

Page 18